# EXHIBIT A

Dec. 28, 2023

To: Judge Andrew P. Gordon
    United States District Court for Nevada

Dear Sir:

Thank you for the opportunity to provide some written thoughts on behalf of my son, Christopher Stephen Housley.  Chris, having just turned 52, finds himself in a most precarious position.  His guilty plea to the felony charges he is facing leaves him little wriggle room at this stage of his life.  His mother, Sandra Kay Housley, and I have raised him since his birth.  Both of us were, during his formative years, both attentive and proactive to his needs and education.  We have, as professionals (Sandy was a county librarian for 26 years; I was an elementary teacher for 35 years- both in California) been able to establish expectations, consequences, and love for both of our children as they grew.  The examples we set were more than adequate for our children to become productive members of their communities.  They were raised with a sense of the importance of family in establishing their own sensibilities as they went out into the world.

Both children have been given an understanding of the societal roles their family members had played prior to their birth.  Chris's great-great grandfather was a Judge in the State of Iowa; his maternal grandfather served honorably in the US Marine Corp for over 25 years; his paternal grandmother was active in the workings of the Democratic Party and was a member of the DAR.  Our children have always understood the value of their families and contributing to the overall welfare of their personal social groups.

For Chris, this desire for a similar heritage was a driving force.  After graduating from San Diego State University, he soon left for Las Vegas to make his fortune as a bartender.  Chris's first few jobs were bare sustenance type positions.  He discovered that by working the graveyard shift, he could acquire better positions that finally allowed him to make enough money to live comfortably.  As he found more security, long-term positions with still better pay, he longed to have a position working regular hours.  This desire turned into a need when his son, Fox, was born in 2016.  In order to be able to spend time with Fox, he sensed that he needed to find a job that had more civilized hours.   As Fox grew, Chris aligned

himself with a former employer who was about to launch the new convention facilities for Caesar's Casinos. He was offered a job (2019), gave notice with the company (The Bar) he had worked for over 7 years, and began training for the "regular hours" position for Caesar's Conventions. Three weeks later, Las Vegas shut down because of the Pandemic and there were few if any jobs left to be had.

At this moment in time, Chris had been caring for, in addition to his young son, another child from the same mother as Fox, who seemed to fall under Chris's financial and emotional protection because his own parents were not interested in raising Madyx. Chris was struggling to make ends meet when he accepted the job of handling mail-order drugs for the company in India. The money was good and he could now be at home with his boys to care for them.

Chris's actions and willingness to sacrifice his good name for the sake of greed was a terrible mistake. He will regret this for the remainder of his life.

Because I have remained close to my son throughout his life, I find myself placing him on a balance scale similar to the scales of justice. On one hand, he has lived an honorable existence and has been a contributing member to the society around him. On the other side, he spent about 22 months dealing in a business that was certainly violating the laws of our country.

I understand that it is the duty of the court to weigh and then level punishment for the charges to which he has plead guilty. He will serve these penalties. But it seems to his father that he has already paid a monumental price of sacrificing both his name and future employment, and the loss of the bond and promise to his children, because of his desire to provide for those children at a time of great upheaval and disruption to an entire country.

The People, in my estimation, would be better served by having Chris involved as much as allowed in his society, contributing to the welfare of his family, and in particular his sons.

Thank you,

Stephen Harper Housley
10036 Los Ranchitos Rd.
Lakeside, Ca.  92040

619-917-4235

To:You

Mon 1/1/2024 3:21 PM

Russell Chun

1365 Fragrant Spruce Ave

Las Vegas, NV 89123

808-228-9489

Dear Judge Gordon:


I am writing this letter on the behalf of my friend and former neighbor, Christopher Housley.  My Family and I lived across the street from Mr. Housley for 3 years until last year when we moved to another neighborhood close by, but we have remained close friends with his sons and our sons play together often.  Mr. Housley introduced himself quickly when we moved into his neighborhood and was always friendly and helpful with all the neighbors.  He often helps his elderly neighbors by fixing minor issues with their houses and helping them with home improvement projects.  He enjoys organizing neighborhood parties for holidays and pool parties during the summer for his neighbors and their children.  He is very well respected and liked in his small community of Silver Oaks Estates where he has been a resident since purchasing his house in 2016.  I have also known Mr. Housley, an avid animal lover, to spend time with his sons volunteering for local dog and pig rescue organizations.

Mr. Housley is a full-time single father who has had sole custody of his 7 year old son, Fox, since he was 3 years old.  Fox lives with Mr. Housley full time.  His stepson, Madyx who is 12 years old, splits time between his biological father's house and Mr. Housley's house.  He spends 4-5 days a week with Mr. Housley and 2-3 days a week with his father, Daniel.  Madyx has lived with Mr. Housley for the last 9 years, remaining with him after Mr. Housley and Madyx's mother broke up in 2016.  He is truly a father figure in Madyx's life, raising him since he was 3 years old.  Madyx attends school in Mr. Housley's neighborhood and I would consider his house as Madyx's primary residence.  Mr. Housley's life revolves around those boys and he is very active in their school activities, sports, and their hobbies.  He truly dedicates all of his time to raising two of the nicest young men I have ever met, and he is an instrumental part in both of their lives, especially Fox who, as I mentioned, lives with him full time.

Mr. Housley was a long time bartender in this town from 2002 until 2020 when he was out of work due to the pandemic.  He returned to bartending in 2021 and 2022 and more recently has started a rental car business with Madyx's father, Daniel Melendez.  They have been developing this new company for almost a year and are having great success and expanding quickly.  I have always known him as a hard worker so that he can provide his sons with everything they could possibly need.  It is my opinion that losing their father to incarceration would be devastating to these boys, especially Fox since Mr. Housley has full custody of him.

Everyone I have ever met who knows Mr. Housley has a great amount of respect for him and the father and man that he is.  Mr. Housley and I have talked many times about his legal troubles and he knows he made some very poor decisions in the way he chose to support his family when he lost his bartending job in 2020.  I would request that you take all the good that Mr. Housley does into consideration during sentencing, as well as the bad.  Thank you for your time.

Sincerely

Russell Chun

 

December 5, 2023

Dear Honorable judge:

My name is Janice Ridondo, I am the founder of Windy's Ranch & Rescue; I am retired from Clark County, where I served for 14 years as a Clark County Commissioner's Liaison. Please accept this letter from me on behalf of Christopher Housley, 187 Jalyn Rea Court, Las Vegas.

My team and I provide semi-annual in-home care for two of Chris' pet pigs; he is our favorite pet pig owner, his animals are sterilized and vaccinated, they are healthy, well fed, and adored by the entire family. Chris' home is clean, warm, and inviting. While I do not know the entire story, I know Chris was caught up in a scheme by others, and I see his pain when faced with the thought of being away from his beautiful and supportive family. Chris is truly genuine, caring, and compassionate. If you could see him with his two sons; I know he is willing to pay his debt to society, but not at the cost of being away from these two young men who adore him and need his presence in their lives every day. He understands he is a role model for them and would never knowingly put himself in a position where he might lose them. I honestly need you to know, Chris will not let you down if you give him the opportunity to stay at home while serving whatever punishment you see fit.

For these reasons and more, I am happy to present this letter to you, as my judgment of Chris' character and sincerely hope you will reduce the sentence and place Chris on probation to allow him to stay with his family and perhaps repay the community by service to local nonprofits.

Respectfully,

Janice*

Windy's Ranch & Rescue is a 100% all volunteer rescue and sanctuary for abandoned, unwanted, and abused pets, specializing in pot belly pigs and farm animals. 702-816-7711

Windy's Ranch & Rescue     Nevada Nonprofit Est. 2009     EIN: 27-3567990

005

Steven Marsh
3326 Stacey Lyn Drive
Las Vegas, NV 89117
(702)881-4433
skmarsh0@yahoo.com


December 19, 2023


Attn: The Honorable Judge Gordon
Re: Character Reference for Christopher Housley


Dear Judge Gordon.


I am writing to provide a character reference for Christopher Housley, who is an extremely close friend and whom I have known for over 16 years. I am aware of the charges being brought against him and the upcoming court proceedings, and I believe it is of the utmost importance to share my perspective and experience with regard to his character and conduct.

Over the years, I have had the privilege of witnessing Christopher demonstrate unwavering integrity, compassion, responsibility, and true, unconditional love, both with his friends and family, namely his son Fox, and stepson, Maddox. A father first, he put his son's health, safety, and welfare above all else when making the decision to seek, and gain, full custody of his son, Fox, due to the inability of his mother to provide adequate care or a safe environment for their son. He has maintained full custody of Fox since then and has made his son the priority of his life, whether helping with schoolwork, attending one of his many extra-curricular activities, or just being a dad. The same can be said for his relationship with his stepson, Maddox, to whom he is a "bonus" dad. In the years of watching him interact with the boys, one would never know that they are not both his own sons, both Fox and Maddox included.

I request that the court take into consideration the detrimental effect that his absence will have on those who depend on him most – his sons. I do not make this request lightly, as I recognize a decision must be rendered that is fair. However, I also have firm belief that, given the opportunity and proper support, Christopher will succeed and show that rehabilitation is a viable and favorable option.

I appreciate your time and consideration of this character reference. Should you have any questions or require clarification on any of the information provided, please do not hesitate to reach out to me at the provided contact details.

Sincerely,



Steven Marsh

Adrian Smith

Bartender

10001 Peace Way Unit 1348 Las Vegas, Nevada 89147

321-331-6699

December 12, 2023

Re: Sentencing of Christopher Housley

Dear Honorable Judge Gordon:

I hope this letter finds you in good health and high spirits.  My name is Adrian Smith and I live in Las Vegas, Nevada.  I am employed with Nevada Restaurant Services, Inc (Dotty's).  I have known and have been friends with Christopher Housley for nearly twenty years.  I am writing this letter on his behalf and asking for leniency in the sentencing phase of this case. I understand the gravity of the situation and do not intend to diminish the severity of the actions for which Christopher Housley is being held accountable.  However, I do believe it is important to provide the court with a more comprehensive understanding of Christopher Housley as an individual.

Christopher Housley is a good friend and has shown remorse for their actions.  They have steered clear of any entanglements with the law and have helped others do the same by either providing counsel or just being there with a good listening ear.  Moreover, Christopher Housley is the sole parent to his very young son, Fox, as well as an amazing stepdad to Fox's older brother.  He has full legal custody of Fox. Please consider this situation when determining an appropriate sentence.

I strongly believe that Christopher Housley is genuinely committed to making amends for his mistakes and for any harm caused and is truly dedicated to leading a law-abiding life moving forward.  A lenient sentence, such as probation, counseling and or a fine, would allow Christopher Housley the opportunity to contribute positively to society while still learning from his mistakes.

I kindly ask the court to consider these aspects of Christopher Housley's character and to weigh them against the severity of the charges.  I believe a compassionate approach would not only serve the interests of justice but also offer Christopher Housley a chance at rehabilitation, redemption and to still be present in his son, Fox's life.

Thank you for your time and consideration.  I trust in the wisdom of the court to make a just decision.

Sincerely,

Adrian Smith

Betzaida Soto
1 Storm Drive, Holtsville, NY 11742
631 707-0763, Betsyst2@gmail.com
January 11, 2024

Honorable Judge Andrew P. Gordon
United States District Court
District of Nevada
333 Las Vegas Blvd South
Las Vegas, NV 89101

RE: Christopher Housley
CASE 2:22-cr-0160-APG-BNW

Dear Honorable Judge Gordon:

My name is Betzaida Soto and I live in New York. I have been employed by Verizon
for the past 37 years, and am currently a Senior Administrative Assistant.
I am writing on behalf of Christopher Housley, who is a very essential member of my family,
and is like a son to me.

I have known Chris for approximately 10 years, and he came into my life while he was dating my
grandson's mother Jayde. At that time my grandson Madyx was approximately 2½ and his mother
was battling addiction. Thankfully Chris without any hesitation stepped in and tended to the safety
and wellbeing of my grandson, and has continued till this day.

My son is a single dad and works many hours, and Chris has always been willing to help him by
sharing in the responsibilities of caring for my grandson, as well as having full custody of his own
son Fox who is now 7, which is also my grandson's brother. My grandson who is now 12 and his
brother are exactly 5 years apart, and share the same birthdate.

Chris is an excellent father and role model. He encourages the boys to enroll in sports, attending
all their practices & games. He is very helpful & attentive with the boys and their schoolwork, and
takes the boys to after school activities. He also teaches the boys how to fix minor plumbing
repairs, a flat on the bike, and also does many DIY projects with them.

Chris makes every effort to reduce the number of hours the boys are on their electronics, and
nearly every day is at the park with them. On the weekends he is always exploring new places to
take them like the museums, sports, parks, trails or any other new event that may be going on.

Chris has always treated me with the utmost respect and affection, and is always willing to help
me and my family. He always remembers to send me photos & videos of the boys during their
outings, and encourages my grandson to facetime me. He has always given the boys 100% and
has always put their needs and the needs of others before his own.

I respectfully request leniency in Christopher Housley's sentencing, as it will have the greatest
impact on the lives of my grandson Madyx and his brother Fox, and hardship on the family.

Sincerely,
Betzaida Soto

Catrina Kelley
8133 Mountain Forest Ct
Las Vegas, NV 89129
702.503.5000
1/4/2023


Judge Gordon
United States District Court
District of Nevada
333 Las Vegas Blvd South
Las Vegas, NV 89101


Dear Judge Gordon:

My name is Catrina Kelley. I am writing this letter on behalf of my ex-husband, Christopher
Housley. Chris and I met in 2003 and married in 2008 and divorced in 2011. Over the years he
has remained one of my best friends and we speak daily. Chris has helped me over the last 13
years since we divorced by helping me with my mortgage payments when needed, handling
anything that needs to be fixed around my house and doing my grocery shopping for me since
2020 when the pandemic caused me to not be able to leave the house because of pulmonary
health issues. Since I don't have any family in Nevada, Chris has been my main support system
for the last 20 years.

Even though our marriage didn't work out, I have always known Chris to be a very loving and
caring person who always wants to make sure the people around him feel loved and cared for.
This has been even more apparent since Chris has become a guardian to his stepson, Madyx,
and then a biological father with Fox. Madyx came into Chris' life in 2014 when he started dating
Madyx and Fox's mother. Due to her alcoholism Jayde quickly pushed a lot of her
responsibilities to Chris as he and Madyx became closer. At that time Danny, who is Madyx's
father and now Chris' business partner, worked very long hours and so Madyx was with Jayde 5-
6 days a week. Chris quickly took on most parenting responsibilities with Madyx and they
quickly became very close and developed a wonderful relationship. There were many times
when Chris would tell me Jayde was drinking so she would leave Madyx at Chris' house while
she was out. Chris, who worked graveyard at the time, would watch Madyx while Jayde worked
during the day at Encore Beach Club as well. He was very excited about the opportunity to care
for Madyx and always sent me pictures of the fun things they were doing. Less than a year after
Chris met Jayde he realized the true extent of her addiction but at that time she was already
pregnant with Fox and I know Chris was also afraid of losing Madyx in his life if they broke up.
Soon after Fox was born Chris would complain that Jayde, who now worked at Omnia nightclub,
would come home from work early in the morning very intoxicated and at times would become

Judge Gordon
1/4/2023
Page 2

violent with him if he tried to keep the boys from seeing this behavior. In October of 2016 when Fox was 6-7 months old Chris told me he was looking for a house to buy so he could break up with Jayde and get Fox into what he considered a safer environment. He had caught Jayde driving with the boys while drunk several times and was very worried for their safety. At that time when Jayde became aware that Chris was going to buy a house, things got much worse at home.

Chris purchased his home in October of 2016 and moved into his new house with the boys in November of 2016. As Jayde spiraled further into alcoholism Chris became the primary caregiver to Fox. Even though custody was still shared at that point, Fox was always with Chris. Madyx also stayed with Chris even though he and Jayde had broken up. Jayde's life was very chaotic at the time and Madyx, at almost 6 years old, realized this and preferred to stay with Chris who he had grown a very strong bond with. Chris employed a full-time babysitter to stay with the boys overnight while he worked and he would stay up during the day to spend time with Fox and Madyx when he wasn't in school. He rarely got any sleep but loved being a father so much he didn't want to miss a minute. Over the next 2 years Jayde fell further into addiction and rarely saw the boys. Chris took Jayde to court and quickly took full legal custody of Fox. Danny did the same for Madyx but Madyx lived with Chris 5 days a week and spent 2 days at Danny's house. Chris has maintained full custody of Fox until this day as Jayde never attempted to get custody back. Madyx still lives with Chris 4-5 days a week and Fox lives with Chris full time. He does see Jayde occasionally but only sleeps at her apartment once every couple of weeks. Although she has tried hard to maintain sobriety she is not at a point in her life where she could be a full-time mother.

In addition to caring for Fox and Madyx, Chris also cares for many pets and is active in volunteering for animal rescues. Chris and both boys are huge animal lovers and have 3 dogs, a cat, and 2 pigs who they love spending time with. As I stated before Chris has a huge heart and has taken responsibility of taking care of many people and animals, me included, who rely on him greatly.

Chris was gainfully employed as a bartender from when he moved to Las Vegas in 2002 until he couldn't bartend anymore due to losing his ability to work to the pandemic in 2020. He spent 18 years at some of the most popular local bars in the Summerlin area and spent 7 years as the top seniority banquet and special events bartender at the Palms from 2006 to 2013, winning several awards for his customer service and job performance. In February of 2020 Chris was hired at Caesar's Forum as a banquet bartender and was very happy to be able to finally get off the graveyard shift that he had spent 18 years on. Having children had made it very hard for Chris to work the overnight shift as the boys became involved in sports and other activities that he needed to be present for. He had completed training for Forum and they were supposed to open on March 18, 2020. 2 days before they were supposed to open the pandemic hit and Forum never opened. I remember Chris was very upset and scared as he had never been

Judge Gordon
1/4/2023
Page 3

unemployed before in his life. He and a friend had started a CBD company in 2019 but they were not even able to make back their initial investments at that time. I remember Chris telling me that he had been contacted by some gentlemen in India from an online pharmacy that he had purchased personal items from in the past. They were having issues with shipping due to the pandemic and wanted Chris to help them ship their products to their customers at the time. Chris, who had been unemployed for a few months and was becoming very worried about supporting his family, accepted, and unfortunately this is where his legal troubles began. Chris was eventually able to open Forum more than a year later but after 6 months there he was very unhappy due to what he felt was an abusive management team, so he left there to try to get back into local bars.

After his arrest Chris became employed with Dotty's, a local bar, for 3 months until his charges kept him from receiving the gaming licensing he needed to work there. He then started driving for Uber and Lyft and due to his ability to be so likable quickly grew a clientele of affluent local families, celebrities, and professional athletes. In addition to being a driver to several people Chris and Madyx's father Danny started a rental car business in May of 2023. They have had tremendous success in their first 7 months and now have a fleet of 9 cars and are now waiting for Chris' sentencing to expand as Chris is instrumental in the success and growth of this new company. Chris and Danny, who is also an animal lover and involved in rescue, want to expand their rental car business and eventually buy a large property where they can start their own animal rescue.

I have been very close to Chris for 20 years. I feel I know him better than anyone besides his parents. I don't believe Chris would have ever gotten caught up in any illegal activities like this unless his back was against the wall. I am not condoning or defending his actions, which he knows were wrong. Chris brings so much good to this world and so many people and animals. He and Fox and Madyx are inseparable and have a wonderful life together. Chris has remained single since 2016 so that he can dedicate all his time to raising the boys. They are both wonderful young men and Chris is especially proud of Fox who is an outstanding athlete and receives straight A's in school. I am very worried about what a sentence of incarceration would do to these boys. I truly don't believe that Jayde is capable of being a full-time mother. Even though Madyx lives with Chris 4-5 days a week, he would be able to live with his father obviously. I am very fearful for Fox to be taken away from the wonderful life he loves. I would plead with you to look at all the good Chris brings to this world compared to the bad he has done due to a terrible lapse in judgement for 2 years. Chris is a wonderful man and anyone who knows him would agree.

Thank you for your time and for taking my views into consideration.

Judge Gordon
1/4/2023
Page 4

Sincerely,


Catrina Kelley

# Daniel Melendez

## Contact

27 Indian Run Way
Las Vegas, NV 89148
702.467.4554


Honorable Judge
Andrew P. Gordon
United States District Court
District of Nevada
333 Las Vegas Blvd South
Las Vegas, NV 89101

RE: Case 2:22-cr-0160-APG-BNW

## Dear Judge Gordon

My name is Daniel Melendez. I am writing this letter on behalf of Christopher Housley. I am the biological father of Chris' stepson, Madyx Melendez, and Chris is my business partner in our rental car business, Cruise Control Day Rentals. He is a man that I not only consider a friend and a business partner, but we are also family.

I first met Chris about 2014 before he met Madyx and Fox's mother, Jayde. We were just acquaintances when Chris met Jayde and Madyx in August of 2014. Chris quickly became a part of Madyx's life due to Jayde's addiction issues and she tended to push her responsibilities of caring for Madyx during the times when she was caring for him. At this time, I was very concerned to have a man I hardly knew caring for my son but as time went on, I could see that Chris truly loved Madyx and was a wonderful influence in his life. When Chris and Jayde broke up in October of 2016 Chris and I agreed that since she was incapable of caring for Madyx and Chris had grown a very strong bond with Madyx, that Madyx should continue to live with Chris part time so Madyx could still be with his brother Fox, who was an infant at the time, and Chris. At that point in time Madyx split time between Chris and I and rarely spent time with his mother due to many instances where she had put Madyx in danger due to her substance abuse while he was in her care.

In 2018 both Chris and I began family court proceedings to get sole legal custody of the boys and due to Jayde's addiction getting worse and her erratic behavior for several years, we were both awarded full legal custody of the boys in 2019. For nearly the last 10 years Chris has been an amazing parent to Madyx and an integral part of his upbringing. We often hear jokes about "My Two Dads" due to our situation, but we are doing what we feel is best for Madyx and I commend Chris for stepping up to help raise Madyx. I think that is a testament for both what kind of man he is and his love for Madyx. Currently Madyx splits time between my house and Chris' house and goes to school in Chris' neighborhood. He does occasionally see his mother but

since she came home from 2 attempts at rehab and many months of sober living, he has only spent 2-3 nights at her house. She was able to finally get her own place maybe 2 years ago but it is a very small apartment and she doesn't have room or sleeping accommodations for the boys. Fox has been with Chris full time since late 2016 and very rarely stays with his mother. I remember Chris telling me the last time Fox stayed with his mother he cried all night and came back to Chris' house early in the morning.

Chris and I started Cruise Control Day Rentals in early 2023. Chris had a long career as a bartender since moving to Las Vegas in 2002, until he was unable to work anymore because of the pandemic. I had known that Chris was interested in working for himself as he had started a CBD company in 2019 with a friend. Unfortunately this company had not worked out as they had hoped. After his arrest in 2022 Chris had trouble finding work because of his inability to pass a background check so we began to think of different business ventures we could do together. In May of 2023 we started Cruise Control, a car rental company operated on the Turo car rental platform. We started with 6 vehicles and after great success we are now up to 9 vehicles that we own or are cohosting for other owners. As we are coming up on a year in business this May, we have achieved Turo "Power Host" status which is their highest tier for Turo hosts. We could expand this very rapidly and we are waiting for the outcome of Chris' sentencing to purchase additional vehicles. He is very important to the growth of this company and his presence is of the utmost importance as this company grows. Our 5 year plan with this business is to own 50 rental cars and to purchase a property that has enough acreage to handle our vehicle storage, have two houses for both Chris and I so Madyx can live with both of us at the same place, and we also plan to start a horse boarding business/animal rescue on our property.

Chris is well known and highly regarded by many people in the community. He is a dedicated father and pet owner and is active in pet rescue locally as well. I am not defending his actions, as they were illegal, but I know he felt backed into a corner and was afraid he couldn't provide for his family at the time of his crimes. He does so much good for so many people and is working hard to build a successful business that will provide for both Madyx and Fox. He is in no way a danger to society and I would ask for lenience in his sentencing. Our company wont be able to grow without him and Fox will lose his primary parent who has raised him nearly

alone since he was an infant.  I appreciate your time and consideration in this matter.

Sincerely,

Daniel Melendez

Eric Powell

10650 King Phillip Court

Santee, CA 92071

Epowell1903@gmail.com  619-626-6153

1/11/2024

Honorable Judge Andrew P. Gordon

United States District Court – District of Nevada

333 Las Vegas Blvd South

Las Vegas, NV 89101

Re: Sentencing of Christopher Stephen Housley, Case Number 2:22-cr-0160-APG-BNW

Dear Judge Gordon:

My name is Eric Powell. I work for the Telecom company CommScope, as a Software IT Specialist; I've worked for this company for the past 34 years. I'm writing on behalf of the defendant Christopher Housley, my brother-in-law. I've known Chris for 24 years, he has been a great brother-in-law in all of the years that I've been married to his sister, Chris and I have never had an argument or disagreement of any sort.

Chris has always demonstrated kindness toward young people and animals, he genuinely has a very kind heart.

I understand the charges against Chris and that he must spend time in prison because of his actions. I just ask for your leniency while determined his sentence. It's extremely difficult to come to the realization that both my father and mother in-law will likely pass away while Chris is in prison, truly heartbreaking. I'm 57 years old, I selfishly hope that my time with Chris has not come to an end as a result of his actions. I hope that he will have time to get his life back in order and have a positive impact on his son's life after serving his prison term.

Sincerely,

Eric Powell

Commented [EP1]:

January 26, 2024

James L Bandy III

2805 Maryland Hills Drive

Henderson, NV 89052


Judge Gordon

United States District Court

District of Nevada

333 Las Vegas Blvd South

Las Vegas, NV 89101


Re: Character Reference for Chris Housley


Dear Judge Gordon,


I am writing to offer a character reference for my friend, Chris Housley, whom I have known for 22 years. His dedication to his sons, Madyx and Fox, exemplifies the epitome of fatherhood.


Chris engages in numerous activities that contribute to the development and well-being of his sons. He takes them fishing and boating, providing invaluable lessons on nature and patience. The care they provide for their potbelly pigs and dogs at home instills a deep sense of responsibility and compassion. Chris also fosters their physical skills through exciting activities such as tightrope walking over pools.


Creativity is a staple in their household, with Chris constructing home fortresses and imaginary spaceships, fueling Madyx and Fox's imagination. His presence is constant, from participating in hikes to playing video games, ensuring he is a central figure in their daily lives.


The contrast between Chris's active involvement and their mother's more hands-off approach is stark. Chris's influence is irreplaceable and a foundational element of Madyx and Fox's upbringing. His absence would be more than a loss; it would be detrimental to their future development and emotional well-being.

In light of my longstanding friendship with Chris and my personal observation of his interactions with his sons, I firmly believe that Madyx and Fox's best interests are served by maintaining their current living arrangement with their father. His role is pivotal in their lives, and any disruption could have lasting negative consequences.

Thank you for considering my perspective on this important matter. Should you require any additional information, please do not hesitate to contact me.

Sincerely,

James L Bandy III

Richard Chavez
3127 Twilight Hills Ave
Henderson, NV
702.858.2142
1/13/2024


Honorable Judge Andrew Gordon
United States District Court
333 Las Vegas Blvd South
Las Vegas, NV  89101


Dear Honorable Judge Andrew Gordon:

Good afternoon Your Honor.  My name is Richard Chavez.  I am a retired detective from the Las
Vegas Metropolitan Police Department where I served for over 22 years. I am also a USMC veteran.
I am writing this letter of support to you today on behalf of Christopher Housley who has been a
friend of mine since 2003.  In addition to being a close friend, I also lived in Chris' guest house for
most of the year 2019 when I was going through a divorce.

I first met Chris in 2003 when he worked at Roadrunner Saloon.  Several officers and I would go
there to relax after work and many of us quickly became friends with Chris.  A small group of us
continue to socialize until this day.  Chris was always the first one to help anyone out with anything
they needed and was known to our group of friends as having a huge heart.  Once Chris met his
stepson, Madyx, in 2014 he became more and more absent at social gatherings.  I could tell he truly
loved being Madyx's stepfather and wanted to spend most of his time with him.  Unfortunately,
Madyx's mother suffered from addiction issues and although we, as Chris' friends, thought he was
being used as a free babysitter while she went out and partied, Chris couldn't have seemed happier
with the extra time with Madyx.  Chris and Jayde had their own child in 2016, Fox.  At this time, I
was going through similar issues as Chris as my wife was also an addict and Chris and I leaned on
each other a lot when we needed support.  In October of 2016, due to increasing substance abuse
by Jayde and because Chris felt the boys were in danger, he broke up with Jayde and bought a new
house.  He was also afraid of mounting legal troubles as she would call officers to the house when
she was under the influence and make false claims against Chris when he threatened to remove the
children from the situation.

Once Chris moved into his new house in November of 2016 things were much better for, he and the
boys.  He took on almost all the parenting responsibilities of Fox and Madyx also moved in with him
even though Jayde and Chris had broken up.  I believe he gravitated to the safer and less chaotic
home of Chris.  Due to my own divorce because of similar substance abuse issues with my ex-wife,

Honorable Judge Andrew Gordon
1/13/2024
Page 2

Chris offered to let me stay in his guest house at the beginning of 2019. This was right about the time that Chris received sole custody of Fox from the Family Court, and at that time no visitation was awarded to Jayde due to her falling deeper and deeper into addiction. Living there just for a short time I witnessed Jayde throwing large rocks into Chris' car, getting a DUI in front of his house, and several other events of her coming over uninvited and intoxicated. Since Chris had already been arrested on a DV charge where he felt Jayde lied to the police, he was always scared to call Metro when she came over to cause trouble. Somehow Chris was always able to shield the boys from witnessing these events. The only time I became involved in such an event was when Jayde came into his house uninvited while he was leaving for a graveyard shift. She came into the house with a bottle of pills and took a handful and stated she was taking her life. Chris had left for work already and the babysitter and I were the only adults here. Metro came and forcefully took her out of the house after a brief struggle. Unfortunately, the children had to witness that.

Chris has worked tirelessly to provide a wonderful upbringing for his son and stepson. Madyx, his stepson, lives 4-5 days a week at his house and 2-3 days a week at his father's (Daniel Melendez's) house. Fox has lived full-time with Chris since November of 2016. Both boys attend school in Chris' neighborhood and are both active in sports and activities. Chris and both of his sons are animal lovers and spend time volunteering for a local pig rescue, as they have 2 rescue pigs themselves along with several other pets.

It is my belief that Chris poses no threat to the public. He has owned up to his mistakes and knows he made a series of very very poor decisions when he lost his job to Covid. He started a successful rental car company with Daniel, Madyx's father, and is also a private driver for many local families, professional athletes, and celebrities. I would ask for leniency in his sentencing so that he can someday soon continue the trajectory that his life has been on since his arrest two years ago. Thank you for your time and consideration.

Sincerely,

Richard Chavez

Shawn Powell
10650 King Phillip Ct.
Santee, CA 92071
(619) 888-2855 / shawn.powell24@gmail.com

January 5, 2024

Honorable Judge Andrew P. Gordon
United States District Court - District of Nevada
333 Las Vegas Blvd South
Las Vegas, NV 89101

Re:     Sentencing of Christopher Stephen Housley, Case Number 2:22-cr-0160-APG-BNW

Dear Judge Gordon:

My name is Shawn Powell (maiden name Shawn Housley) and I am the sister of Christopher
Housley (the defendant). I am an elementary school teacher in my 14th year of teaching in San
Diego, CA. Prior to changing my career to teaching, I worked for 11 years at a mortgage
company as an administrative assistant. I have been married for 20 years and have 3 adult
(step) daughters, a 15 year old son, and 6 grandchildren ages 1-5 years. My family is the most
important thing to me in my life.

I am writing on behalf of my only brother, Chris, to request leniency in his sentencing. I know
that there must be consequences for the crimes he has committed. I am not asking that he be
absolved of responsibility for his actions and choices, only that these consequences do not take
away the rest of his life and impact his children's lives any more than they must. My brother
deeply regrets his actions and wishes nothing more than to have the chance to lead a
productive, law-abiding life with his family, as he has done since his arrest. Please, please give
Chris, his sons, and our family, the shortest possible prison sentence.

My brother is the type of person who would give the shirt off his back to help his family or his
friends. He is one of the most generous people I have ever known and has improved the lives of
countless people and animals with his care and thoughtfulness throughout his life. Chris is the
primary caretaker for his son (Fox, age 7) and his son's half-brother (Madyx, age 12). Although
he co-parents with both boys' mother and Madyx's father, Chris is the parent that has provided
both boys with stability, security, love, attention, and guidance over the past 9 years. Chris has
quite literally dedicated his life to the boys and to ensuring that they have not only the
necessities, but also fun and meaningful life experiences, raising them to be thoughtful and
amazing human beings. The boys' mother is a recovering alcoholic and is not always reliable
which is of great concern to our family.

I love my brother very much and it's impossible for me to articulate in a short letter what an
amazing parent he is and what a special person he is. I wish I knew the exact right combination
of words that would demonstrate that he deserves your leniency. Thank you sincerely for taking
the time to consider my request for leniency.

Respectfully,

Shawn Powell

Shawn Powell

Robert and Joylyn Wright
5955 Hopkinsville Court
Las Vegas, Nevada 89148
Cell 702-354-6717

January 4th, 2024

The Honorable Andrew P. Gordon,

Re: Sentencing of Christopher Housley

We are writing you in support of our dear close friend Christopher
Housley.  We have independently known Christopher for approximately 20
years and were introduced to each other, through him 13 years
ago.  Christopher is the only person we asked to speak during our wedding.

We have witnessed the struggles Christopher has been through as a single
father, raising his seven-year-old son Fox, whose mother has been mostly
absent Fox's entire life.  In addition, Christopher stepped in as a primary
caregiver to Fox's half-brother Madyx, because of their mother's inability to
care for them.  Christopher has also put the needs of his children above
anything else.  Anyone who personally knows Christopher, can attest to how
much of a devoted father he is to Fox and Madyx.

We feel Christopher is a perfect example of someone who deserves a chance
to prove he is a productive member of society and pray, for the sake of Fox
and Madyx, the court shows some leniency in this case.

Respectfully,
Robert and Joylyn Wright

# EXHIBIT B



# RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010



**UNITED STATES SENTENCING COMMISSION**
**September 2021**

United States Sentencing Commission
One Columbus Circle, N.E.
Washington, DC 20002
www.ussc.gov

Charles R. Breyer
Acting Chair

Patricia K. Cushwa
*Ex Officio*

Jonathan J. Wroblewski
*Ex Officio*



Kenneth P. Cohen
Staff Director

Glenn R. Schmitt
Director
Office of Research and Data

September 2021

United States Sentencing Commission

rate was five times as high (46.9%) for CHC VI offenders in that age group; a rate comparable to CHC I offenders aged 21 to 29 at release (48.5%). At the other end of the spectrum, all offenders younger than age 21 at release and in CHCs IV, V, and VI were rearrested. Because CHC is determined, in part, by the number and length of prior sentences, only 19 offenders were under the age of 21 and in CHC IV, V, and VI. There were 347 offenders under the age of 21 at release in CHC I, and two-thirds (66.6%) of those offenders were rearrested, a rate comparable to CHC V offenders aged 40 to 49 (67.4%).

Similarly, in the 2005 cohort, offenders aged 60 and older in CHC I had the lowest rearrest rate, 11.3 percent. In comparison, 53.0 percent of CHC I offenders in the youngest age group in that study, younger than 30 years of age, were rearrested. Considering CHC VI offenders in that study, 37.7 percent of offenders aged 60 and older were rearrested, compared to 89.7 percent of offenders younger than 30 years of age.



**Separately, age and criminal history are consistent predictors of recidivism. Considered together, they are even better predictors of recidivism.**

Table 4.  Rearrest Rates by Age at Release and Criminal History Category
*Federal Offenders Released in 2010*

| AGE | CRIMINAL HISTORY CATEGORY (CHC) | | | | | | TOTAL |
|---|---|---|---|---|---|---|---|
| | CHC I | CHC II | CHC III | CHC IV | CHC V | CHC VI | |
| Younger than 21 | 66.6% | 84.1% | 90.7% | 100.0% | 100.0% | 100.0% | 75.3% |
| 21 – 29 | 48.5% | 66.6% | 77.5% | 85.4% | 86.4% | 89.9% | 69.4% |
| 30 – 39 | 31.2% | 49.5% | 64.8% | 71.4% | 77.6% | 81.1% | 54.1% |
| 40 – 49 | 22.3% | 41.6% | 50.6% | 59.9% | 68.8% | 74.2% | 42.7% |
| 50 - 59 | 15.0% | 30.8% | 46.4% | 48.6% | 61.7% | 65.8% | 30.8% |
| 60 and Older | 9.4% | 18.2% | 28.1% | 30.0% | 48.6% | 46.9% | 15.9% |
| TOTAL | 30.2% | 49.4% | 61.9% | 71.6% | 75.9% | 74.1% | |

*Recidivism of Federal Offenders Released in 2010*

# ADDITIONAL CHARACTERISTICS

## Offender Characteristics

As shown in Table 5, male offenders had substantially higher rearrest rates (52.3%) compared to female offenders (35.1%) during the study period.  Black offenders had the highest rearrest rates (58.2%), followed by Other Races (50.2%), Hispanic (46.5%), and White (42.9%) offenders. These demographic differences in rearrest rates, however, must be considered in light of the association between criminal history and recidivism discussed above.  Black offenders had the smallest proportion (30.0%) of offenders in CHC I compared to White (52.7%), Hispanic (55.3%), and Other Races (58.2%).  Also, Black offenders had the largest proportion (16.5%) of offenders in CHC VI compared to White (9.1%), Hispanic (6.5%), and Other Races (4.6%).  Rearrest rates were comparable for offenders in the highest CHC.  For offenders in CHC VI, the rearrest rates were as follows:  Black (75.0%), White (78.3%), Hispanic (74.1%), and Other Races (80.8%).

Rearrest rates decreased steadily for each successive increase in educational level.  More than half of offenders who did not complete high school (60.8%) or graduated high school (50.2%) were rearrested.  In comparison, 37.2 percent of offenders with some college and 19.6 percent of college graduates were rearrested during the study period.

Table 5.  Rearrest Rates by Offender Characteristics
*Federal Offenders Released in 2010*

| Offender Characteristics | % Rearrested |
|---|---|
| **Gender** | |
| Male | 52.3% |
| Female | 35.1% |
| **Race/Ethnicity** | |
| White | 42.9% |
| Black | 58.2% |
| Hispanic | 46.5% |
| Other | 50.2% |
| **Education** | |
| Less than High School | 60.8% |
| High School Graduate | 50.2% |
| Some College | 37.2% |
| College Graduate | 19.6% |

Rearrest rates based on these offender characteristics were the same for offenders released in 2005.  In the *2016 Recidivism Overview Report*, the Commission reported that 52.2 percent of male offenders and 36.4 percent of female offenders were rearrested during the study period.  In addition, eight years after release into the community, Black offenders had been arrested at the highest rates (59.1%), followed by Other Races (49.4%), Hispanic (49.1%), and White (41.7%) offenders. Education levels were similarly associated with different rates of recidivism. Offenders who did not complete high school had the highest recidivism rates (60.4%), followed by high school graduates (50.7%) and those with some college (39.3%).  College graduates had the lowest rates (19.1%).[80]

United States Sentencing Commission

Figure 17.  Rearrest Rates by Federal Offense Type
*Federal Offenders Released in 2010*



## Offense Characteristics

Rearrest rates varied substantially by the type of offense for which offenders were originally sentenced (Figure 17). Offenders sentenced for a federal firearms offense had the highest rearrest rate, 70.6 percent, followed by robbery (63.2%) and immigration[81] (56.7%).  Fewer than half of offenders sentenced for drug trafficking (48.0%), fraud, theft, or embezzlement (35.5%), and all other offenses (41.9%)

were rearrested.[82]  In addition, offenders who were released following sentencing for a violent offense were more likely to be rearrested than non-violent offenders, 59.9 percent compared to 48.2 percent (Figure 18).

These findings reflect previous Commission findings for federal offenders released in 2005.  In its *2016 Recidivism Overview Report*, the Commission reported the highest rearrest rates for offenders who were released following sentences for firearms (68.3%) and robbery (67.3%) offenses.  In addition, the lowest rearrest rates were for offenders sentenced for fraud (34.2%), larceny (44.4%), and all other (42.0%) offenses.[83]  In addition, in its *2017 Recidivism Criminal History Report* the Commission determined that 64.1 percent of violent offenders were rearrested during the study period.[84]

> "
> **Offenders sentenced for a federal firearms offense had the highest rearrest rate.**



**United States Sentencing Commission**

www.ussc.gov

THURGOOD MARSHALL FEDERAL JUDICIARY BUILDING

ONE COLUMBUS CIRCLE N.E.

SUITE 2-500, SOUTH LOBBY

WASHINGTON, DC 20002-8002

# EXHIBIT C

Scholarship Repository
University of Minnesota Law School

| Articles | Faculty Scholarship |
| --- | --- |

2006

# Purposes and Functions of Sentencing

Michael Tonry
*University of Minnesota Law School*, tonry001@umn.edu

Follow this and additional works at: https://scholarship.law.umn.edu/faculty_articles

 Part of the Law Commons

**Recommended Citation**
Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1 (2006), *available at* https://scholarship.law.umn.edu/faculty_articles/495.

This Article is brought to you for free and open access by the University of Minnesota Law School. It has been accepted for inclusion in the Faculty Scholarship collection by an authorized administrator of the Scholarship Repository. For more information, please contact lenzx009@umn.edu.

*Michael Tonry*

# Purposes and Functions of Sentencing

ABSTRACT

American sentencing systems have fragmented since the modern sentenc-
ing reform movement began in the 1970s and predominant retributive
theories of punishment have become obsolete. Indeterminate sentencing
was ubiquitous, but when it lost credibility, no single approach replaced it.
Every American jurisdiction has a crazy quilt of diverse and, in principle if
not practice, irreconcilable elements. Influential retributive theories of
punishment were a 1970s response to 1970s problems that no longer gal-
vanize opinion or reform. They are incompatible with the recent growth
of restorative and community justice, therapeutic jurisprudence, prisoner
reentry programs, and knowledge about the effectiveness of treatment pro-
grams. Theories of punishment can provide normative criteria by which
policies and practices can be measured, but to be used in that way they
must speak to their own times. New sentencing systems more effective
and more just than current fragmented systems can be developed, and
they will be better if new normative theories germane to them develop in
tandem.

Sentencing policy in the United States has fragmented. There is no
overriding theory or model. There are no widely shared understand-
ings about what sentencing can or should accomplish or about con-
ceptions of justice it should incorporate or reflect. Painting with a
broad brush, utilitarian ideas held sway in the United States from 1900
through the mid-1970s (evidenced most strongly by indeterminate sen-
tencing and extensive parole release), followed in succession by retrib-
utive ideas (evidenced most strongly by desert-based guidelines systems

Michael Tonry is Sonosky Professor of Law and Public Policy and director of the
Institute on Crime and Public Policy at the University of Minnesota Law School, and
senior fellow in the Netherlands Institute for the Study of Crime and Law Enforcement,
Leiden. I am grateful to Marc Miller, who first proposed I write on the subjects of this
essay. An earlier version of this essay appeared in the *Stanford Law Review* (Tonry 2005a).

© 2006 by The University of Chicago. All rights reserved.
0192-3234/2006/0034-0006$10.00

1

28    Michael Tonry

The preventive functions center on the collective interest in domestic tranquility, on enabling citizens to get on with their lives in security. These are core functions of the state and basic goals of criminal law and punishment. If they are to be pursued effectively, policy makers need to take account of the considerable body of knowledge on the effectiveness of sanctions.

Precisely how crime prevention, fear reduction, and cost savings should be sought involves policy decisions about which reasonable people differ and depends in part on what normative purposes are deemed applicable. I assume though that most policy makers regard crime prevention as among the justifiable normative purposes even if some sets of normative purposes that might be adopted might constrain the policy options available to pursue them. That being so, knowledge of what works, and what doesn't, is essential.

Writing on this subject is a ticklish business because it is probably generally assumed that the writer has axes to grind that shape how the evidence is summarized. Perhaps surprisingly, however, there is broad agreement among academics of liberal (e.g., Ruth and Reitz 2003) and conservative (e.g., Wilson 2002) political inclinations about conclusions to be drawn from research on the preventive effects of criminal sanctions and criminal justice interventions.

1. *Deterrence.*   Current knowledge concerning deterrence is little different than eighteenth-century theorists such as Beccaria ([1764] 1995) supposed it to be: certainty and promptness of punishment are more powerful deterrents than severity. This does not mean that punishments do not deter. No one doubts that having a system of punishment has crime-preventive effects. The important question is whether changes in punishments have marginal deterrent effects, that is, whether a new policy causes crime rates to fall from whatever level they would otherwise have been at. Modern deterrent strategies, through sentencing law changes, take two forms: increases in punishments for particular offenses and mandatory minimum sentence (including "three-strikes") laws.

Imaginable increases in severity of punishments do not yield significant (if any) marginal deterrent effects. Three National Academy of

---

approaches than are now common in the United States. Fear of crime can be addressed by things such as increased visible police presence on the streets and improved neighborhood conditions (e.g., more street lighting, prompt repair of vandalized public property, altered traffic patterns) that lie far beyond the reach of the sentencing judge.

Sciences panels, all appointed by Republican presidents, reached that conclusion (Blumstein, Cohen, and Nagin 1978; Blumstein, Cohen, Roth, and Visher 1986; Reiss and Roth 1993), as has every major survey of the evidence (Cook 1980; Nagin 1998, 1999; von Hirsch et al. 1999; Doob and Webster 2003). This is also the belief, in my experience, of most experienced judges and prosecutors.

There are a number of good practical reasons why this widely reached conclusion makes sense. First, serious sexual and violent crimes are generally committed under circumstances of extreme emotion, often exacerbated by the influence of alcohol or drugs. Detached reflection on possible penalties or recent changes in penalties seldom if ever occurs in such circumstances. Second, most minor and middling and many serious crimes do not result in arrests or prosecutions; most offenders committing them, naïvely but realistically, do not expect to be caught. Third, those who are caught and prosecuted almost always are offered plea bargains that break the link between the crime and the prescribed punishment. Fourth, when penalties are especially severe, they are often, albeit inconsistently, circumvented by prosecutors and judges. Fifth, for many crimes including drug trafficking, prostitution, and much gang-related activity, removing individual offenders does not alter the structural circumstances conducing to the crime. Sixth, even when one ignores all those considerations, the idea that increased penalties have sizable marginal deterrent effects requires heroic and unrealistic assumptions about "threat communication," the process by which would-be offenders learn that penalty increases have been legislated or are being implemented.

Mandatory minimum penalties including three-strikes laws are nothing more than efforts to deter crime through penalty increases. The clear weight of the evidence, not surprisingly given what we know about severity increases generally, is that they are seldom if ever crime preventatives (e.g., Tonry 1996, chap. 4; Zimring, Hawkins, and Kamin 2001). Besides the not inconsiderable problem that mandatory minimums often are circumvented by practitioners, and always will be, the best evidence suggests that they have no marginal deterrent effects or have only modest effects that quickly waste away.

There is no good evidence that justifies fine-tuning sentences in individual cases, or enacting mandatory minimum sentence laws, for deterrent reasons. Having a system of punishments has deterrent effects. Having punishments scaled to the severity of offenses should